Jack ANDREWS et al., Plaintiffs,

·v.

L. G. BALLARD, D. O., et al., Defendants.

Civ. A. No. H–77–999.

United States District Court,
S. D. Texas,
Houston Division.

July 9, 1980.

Michael A. Maness, Houston, Tex., for plaintiffs.

Bill Campbell, Asst. Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM AND ORDER

McDONALD, District Judge.

### INTRODUCTION

This is a challenge to the constitutionality of Articles 4510, 4510a, 4510b, and 4505(12) and (15) of the Texas Medical Practice Act, *Tex.Rev.Civ.Stat.Ann.* arts. 4495–4512, as applied to the practice of acupuncture, and Rules 386.01.12.001–.002 of the Texas State Board of Medical Examiners. Those articles and rules generally provide that only licensed physicians can practice acupuncture in the state of Texas.[1] The plaintiffs are 46 residents of Harris County, Texas, who seek acupuncture treatment. They maintain that the constitutional right of privacy, protected by the Due Process Clause of the Fourteenth Amendment, encompasses the decision to obtain or reject medical treatment and that Articles 4510, 4510a, 4510b, and 4505(12) and (15) and Rules 386.01.12.001–.002 impermissibly deprive them of that right because they (a) virtually eliminate the practice of acupuncture in Texas and (b) are not necessary to serve the State's interest in protecting the health and safety of the patient.[2] After trying this action from August 20, 1979, through August 27, 1979, the parties comprehensively briefed the issues. The Court has fully reviewed those briefs, the facts, and the law. For the reasons stated herein, it finds that the challenged articles and rules do not withstand constitutional scrutiny.

### THE CHALLENGED ARTICLES AND RULES

Acupuncture is not explicitly mentioned in the Texas Medical Practice Act. *Tex. Rev.Civ.Stat.Ann.* arts. 4495–4512. It is, however, included within the Act's definition of the "practice of medicine." *Tex. Rev.Civ.Stat.Ann.* arts. 4510, 4510a;[3]

---

1. See notes 3, 4, 5, 13 *infra*, for the text of those articles and rules.

2. Relying on *Wensel v. Washington* (Super. Ct. D.C., Civ. Div. 1975), *reprinted in Lewis v. District of Columbia Commission on Licensure to Practice the Healing Art*, 385 A.2d 1148, 1154 app. (D.C. 1978), the plaintiffs also argue that the articles and rules in question are not "rationally related" to a "constitutionally permissible" state purpose. *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972). Given the Court's resolution of the plaintiffs' right of privacy claim, this argument need not be addressed.

3. Article 4510, *Tex.Rev.Civ.Stat.Ann.* (footnote deleted), provides as follows:

 Any person shall be regarded as practicing medicine within the meaning of this law: (1) Who shall publicly profess to be a physician or surgeon and shall diagnose, treat, or offer to treat, any disease or disorder, mental or physical, or any physical deformity or injury, by any system or method, or to effect cures

*Thompson v. Texas State Board of Medical Examiners,* 570 S.W.2d 123, 127 (Tex.Civ. App., Tyler 1978) (application for writ returned, no reversible error). Thus, the practice of acupuncture without a license is, under Article 4510b of the Act, a misdemeanor, punishable by a fine of not less than fifty and not more than five hundred dollars and imprisonment for not more than thirty days. Each day of unlicensed practice is punishable as a separate offense.[4] In addition, licensed practitioners are prohibited from allowing others to use their licenses to practice acupuncture, *Tex.Rev.Civ.Stat. Ann.* art. 4505(12), and from "aiding or abetting, directly or indirectly," the practice of acupuncture by an unlicensed individual. *Tex.Rev.Civ.Stat.Ann.* art. 4505(15). Violation of either of these prohibitions is punishable by revocation of one's license to practice medicine.[5]

The Texas State Board of Medical Examiners is the agency charged with the primary responsibility for enforcing the Medical Practice Act. *See Tex.Rev.Civ.Stat. Ann.* art. 4495. Prior to 1974, the Board did not apply these articles of the Medical Practice Act, despite their seeming applicability, to the practice of acupuncture in Texas.[6] In that year, however, according to the testimony of Dr. Max Butler, a member of the Texas State Board of Medical Examiners from 1974 through the present and currently the agency's President, the Board became concerned that the public was being exploited by individuals claiming to be acupuncturists. None of the Board's members, it should be noted, are experts on the theory or practice of acupuncture. After holding hearings at which a "fair number" of witnesses, none of whom were acupuncturists or experts on acupuncture, testified,[7] the Board issued a policy statement on acupuncture. That statement, dated December 2, 1974,[8] announced that acupuncture con-

---

thereof; (2) or who shall diagnose, treat or offer to treat any disease or disorder, mental or physical or any physical deformity or injury by any system or method and to effect cures thereof and charge therefor, directly or indirectly, money or other compensation; provided, however, that the provisions of this Article shall be construed with and in view of Article 740, Penal Code of Texas, and Article 4504, Revised Civil Statutes of Texas as contained in this Act.

Article 4510a, *Tex.Rev.Civ.Stat.Ann.*, is almost identical in content.

**4.** Article 4510b, *Tex.Rev.Civ.Stat.Ann.*, states:

Any person practicing medicine in this State in violation of the preceding Articles of this Chapter shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than Fifty Dollars ($50), nor more than Five Hundred Dollars ($500), and by imprisonment in the county jail for not more than thirty (30) days. Each day of such violation shall be a separate offense.

**5.** Article 4505(12) and (15), *Tex.Rev.Civ.Stat. Ann.*, provide:

The State Board of Medical Examiners may refuse to admit persons to its examinations, and to issue license to practice medicine to any person, for any of the following reasons:

\* \* \* \* \* \*

(12) The impersonation of a licensed practitioner, or permitting, or allowing, another to use his license, or certificate to practice medicine in this State, for the purpose of treating, or offering to treat, sick, injured, or afflicted human beings.

\* \* \* \* \* \*

(15) The aiding or abetting, directly or indirectly, the practice of medicine by any person not duly licensed to practice medicine by the Texas State Board of Medical Examiners.

**6.** This may be, in part, because of the relative lack of awareness of acupuncture demonstrated by the Western medical community and the American people prior to former President Nixon's trip to the People's Republic of China in 1972. *See Wensel v. Washington, supra* note 2, at 1160.

**7.** Much of this recitation of events is based on Dr. Butler's testimony. Doctor Butler stated that a "fair number" of witnesses spoke at the Board's 1974 hearings on acupuncture, but was unable to give a more specific estimate.

**8.** The Board's December 2, 1974, policy statement on acupuncture reads as follows:

The practice of medicine is defined by Article 4510, Revised Civil Statutes of Texas as the diagnosing, treating, or offering to treat any disease or disorder, mental or physical, or any physical deformity or injury by any system or method and to effect cures thereof. Acupuncture is a procedure which purports to effect cures or treatment of disease, mental or physical disorder, physical deformity or injury and is, therefore, the practice of medicine under the Texas Medical Practice Act. Acupuncture is deemed by the State Board of Medical Examiners to be an experimental procedure, the safety of which has not been

stituted the practice of medicine within the meaning of the Texas Medical Practice Act; that acupuncture was an "experimental procedure," the safety and effectiveness of which had not been established; that although "acupuncture practice by licensed physicians should not be absolutely prohibited, safeguards" were necessary to protect the public; that the practice of acupuncture by anyone who was not a licensed physician would constitute the unlicensed practice of medicine; and that any licensed physician delegating the authority to perform acupuncture to an unlicensed person would be subject to action against his license for unprofessional conduct and the lending of a license to practice medicine.[9]

As Texas law does not provide for the issuance of policy statements by the Board, the December 2, 1974, statement did not, it appears, have the force of law. According to the brief filed by the Attorney General of Texas in *Thompson v. Texas State Board of Medical Examiners, supra,* it "served only as a notice to practitioners of what the law *was* in regard to acupuncture and the intent of the Board to apply the statute literally in the area." *Brief of Appellee,* at 6 (emphasis in original).[10] Any doubts about the Board's intent were soon eliminated. In October, 1975, the Board disciplined two physicians, Dr. Oliver H. Thompson and Dr. Raul Baptista Mascarenhas, for allowing unlicensed individuals to practice acupuncture under their supervision. *Thompson v. Texas State Board of Medical Examiners, supra,* at 126. Ordering cancellation of the physicians' licenses to practice medicine, it stayed execution of the order and placed the doctors on probation for a period of ten years. *Id.* at 127.

Doctors Thompson and Mascarenhas challenged this action by appealing in state court. They argued, among other things, that the December 2, 1974, policy statement "promulgated and considered by the Board was not an effective rule or regulation of

established, nor has it been established in what instances, if any, acupuncture may be used beneficially. The Board therefore determines that while acupuncture practice by licensed physicians should not be absolutely prohibited, safeguards are necessary to insure that the public is not harmed or victimized by unprofessional practices, such as the unskilled or uninformed application of acupuncture treatment, or unfounded claims of effectiveness.

Therefore, any person performing Acupuncture who is not a licensed physician and subject to the provisions of Article 4505, Revised Civil Statutes of Texas, would be practicing medicine without a license and would be in violation of the Medical Practice Act of Texas.

The Board determines that it shall be deemed unprofessional conduct, as well as the lending of a license to practice medicine, and grounds for action against the license of any physician pursuant to Article 4505, Revised Civil Statutes of Texas, for a physician to offer or administer acupuncture treatment except in compliance with the requirements set forth in this statement and the Medical Practice Act of Texas. Furthermore, a licensed physician may not delegate to any person not licensed to practice medicine in the State of Texas the authority to perform acupuncture.

9. Between December 1 and 4, 1974, approximately the same time as the Texas State Board of Medical Examiners was issuing its policy statement on acupuncture, the House of Delegates of the American Medical Association adopted Resolution 55:

*RESOLVED,* That it is the current judgment of the American Medical Association that since the practice of acupuncture in the United States is an experimental medical procedure it should be performed in a research setting by a licensed physician or under his direct supervision and responsibility, and therefore the AMA urges its constituent state and territorial associations to seek appropriate legislation and rules and regulations to confine the performance of acupuncture to such research settings.

The Food and Drug Administration had taken a similar position the year before in a notice governing the labeling of acupuncture needles. 38 *Fed.Reg.* 6419 (March 9, 1973). To the Court's knowledge, AMA Resolution 55 and the March 9, 1973, FDA notice remain in effect. *See* 44 *Fed.Reg.* 63299 (November 2, 1979); Food and Drug Compliance Policy Guide 714.17 (March 22, 1978).

10. The entire record in *Thompson v. Texas State Board of Medical Examiners, supra,* was filed with the Court on March 20, 1978. It was originally submitted pursuant to the March 6, 1978, order of United States District Court Judge Carl O. Bue in reference to the defendants' Motion to Dismiss.

the Board and was without force and effect." *Thompson v. Texas State Board of Medical Examiners, supra* at 126. On January 8, 1976, while that challenge was pending, the Board acted to correct this situation. Although it took no evidence and heard no testimony, it "formally reconsidered"[11] its December 2, 1974, policy statement on acupuncture and, pursuant to Articles 4496 and 4509, *Tex.Rev.Civ.Stat.Ann.*, reissued the statement as a set of formal rules having the force of law.[12] Those rules, Rules 386.01.12.001–.002 of the Texas Board of Medical Examiners,[13] still in effect, presently constitute the only explicit regulation of the practice of acupuncture in Texas.

On July 27, 1978, the Texas Court of Civil Appeals issued its decision in *Thompson v. Texas State Board of Medical Examiners, supra*. It rejected the doctors' attack on the Board's December 2, 1974, policy statement and upheld the Board's disciplinary action against Doctors Thompson and Mascarenhas. Its ruling made clear that the provisions of the Medical Practice Act, independent of and in addition to any policy statements or rules issued by the Board of Medical Examiners, prohibit nonphysicians from practicing acupuncture in the State of Texas. The court did not, however, fully discuss all of the doctors' contentions. One argument advanced by Doctors Thompson and Mascarenhas was that the Board's action violated "the right of patients to receive medical treatment of their choosing." *Id.* at 126. This argument was not addressed, although the court did say that "the State may not constitutionally proscribe acupuncture within its boundaries." *Id.* at 129. That may be because the plaintiffs in *Thompson v. Texas State Board of Medical Examiners, supra*, were doctors, not patients, or it may be because the court assumed that "the Board ha[d] not precluded any patient from receiving acupuncture treatment." *Id.* at 129. Whatever the proper explanation, the plaintiffs in the present case are patients, not doctors. They directly challenge the court's assumption. They maintain that the challenged articles and rules effectively eliminate the practice of acupuncture in Texas, thereby

**11.** This description of the Board's January 8, 1976, activities is attributable to Dr. Butler, the Board's President.

**12.** The questionable legal force of the December 2, 1974, policy statement may not have been the only motivation for the Board's decision to reissue its December 2, 1974, policy statement on acupuncture as a set of formal rules on January 8, 1976. The Administrative Procedure and Texas Register Act, *Tex.Rev. Civ.Stat.Ann.* art. 13a, which provides uniform standards for the procedures to be followed by all Texas agencies in promulgating rules, became effective on January 1, 1976.

**13.** Rules 386.01.12.001–.002 of the Texas State Board of Medical Examiners read as follows:
.001. Purpose. (a) The practice of medicine is defined by Article 4510, Revised Civil Statutes of Texas as the diagnosing, treating, or offering to treat any disease or disorder, mental or physical, or any physical deformity or injury by any system or method and to effect cures thereof.
(b) Acupuncture is a procedure which purports to effect cures or treatment of disease, mental or physical disorder, physical deformity or injury and is, therefore, the practice of medicine under the Texas Medical Practice Act.

(c) Acupuncture is an experimental procedure, the safety of which has not been established, nor has it been established in what instances, if any, acupuncture may be used beneficially. While acupuncture practice by licensed physicians should not be absolutely prohibited, safeguards are necessary to insure that the public is not harmed or victimized by unprofessional practices, such as the unskilled or uninformed application of acupuncture treatment, or unfounded claims of effectiveness.
.002. Enforcement. (a) Any person performing Acupuncture who is not a licensed physician would be practicing medicine without a license and would be in violation of the Medical Practice Act of Texas, Articles 4510a and 4510b, V. A. C. S.
(b) It shall be deemed unprofessional conduct, as well as the lending of a license to practice medicine, and grounds for action against the license of any physician pursuant to Articles 4505 and 4506, V. A. C. S., for a physician to offer or administer acupuncture treatment except in compliance with the requirements set forth in these Rules and the Medical Practice Act of Texas. A licensed physician may not delegate to any person not licensed to practice medicine in the State of Texas the authority to perform acupuncture.

depriving them of their rights. That issue was not faced in *Thompson v. Texas State Board of Medical Examiners, supra.* Moreover, had it been, this Court would simply have to face it again. "[T]he federal judiciary," it is firmly established, "is supreme in the exposition in the law of the Constitution." *Cooper v. Aaron*, 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958).

## ACUPUNCTURE THEORY AND PRACTICE

Before proceeding to the merits of this action, it may prove useful to review the theory and practice of acupuncture. Acupuncture, one branch of traditional Chinese medicine, has been practiced for 2,000 to 5,000 years. It consists of the insertion and manipulation of very fine needles at specific points on or near the surface of the skin.[14] The needles, solid in construction, are usually one to three inches in length, although needles ranging from one-third of an inch to eight inches may be used.[15] They are generally made of stainless steel, although other metals are often employed, and are sterilized before insertion. They may be used to affect the perception of pain (acupuncture analgesia) or to treat certain diseases or dysfunctions (acupuncture therapy).

The traditional Chinese explanation of how acupuncture works relies heavily on concepts unfamiliar to the Western scientific community.[16] According to traditional Chinese theory, the basic energy or force of life, which flows through all living things, is called "Ch'i." When this force flows through the human body, it travels along twelve primary and two secondary channels or meridians. It is along these channels that the acupuncture points lie. Ch'i, traditional Chinese theory teaches, has two aspects to it: Yin, the negative aspect, and Yang, the positive aspect. The twelve primary channels through which Ch'i flows are divided accordingly into six Yin and six Yang channels and paired. For each Yin channel, there is a Yang channel.

Despite the reference to them as "negative" and "positive," as Yin and Yang are two aspects of the same force, one is no more desirable than the other. In fact, it is a basic tenet of traditional Chinese theory that Yin and Yang must be in balance for Ch'i to flow freely and for all living things, therefore, to function properly. Thus, the theory teaches that it is when Yin and Yang are out of balance that the body is susceptible to pain and illness. Acupuncture treatment is designed to correct this imbalance. The skilled acupuncturist, by placing and manipulating the needles in the proper points, brings Yin and Yang back into balance. This allows Ch'i to flow freely and the body's natural defenses to combat disease and pain.[17]

---

14. Acupuncture is often, but need not be, conducted in concert with a process known as "moxabustion," the heating of the acupuncture points, either through or in the absence of the needles, with a slow burning herb (artemesia vulgaris) commonly called "moxa." Electricity may also be passed through the needles by attaching them to a low-voltage battery, a process called electroacupuncture.

15. The longer needles are inserted parallel to the plane of the skin.

16. For example, Dr. Richard Kroening, Medical Director of the Pain Management Clinic at the UCLA School of Medicine and Chairman of the Acupuncture Advisory Committee of the California Board of Medical Quality Assurance, who both teaches and administers acupuncture treatment, testified that the traditional Chinese explanation of the mechanism by which acupuncture works was not, in the Western sense of the word, a "scientific" one.

17. Much of this can be expressed in more familiar terminology. "Everything is basically electrical," says the *World Book Encyclopedia*, Vol. 6, at 147 (1980). "All matter consists of atoms." It contains electrons, "negative particle[s] of electricity," and protons, "positive particle[s] of electricity. These tiny particles always have equal, but opposite, charges of electricity." *Id.* (Emphasis deleted.) They are, in other words, in balance.

The *World Book Encyclopedia* goes on to say that "the brain continually" sends "small waves of electricity" through the body. *Id.*, Vol. 2, at 460b. It is not unreasonable to assume that the disruption of those waves could adversely affect the body. Nor is it illogical to conclude that the form of those waves could be altered by the insertion into the skin and manipulation of tiny metal needles.

The reference to electrical theory is particularly enlightening in two further respects. First, it allows us to see how Yin and Yang,

**1044**

Western doctors have advanced a variety of alternative theories as to how acupuncture works.[18] *See* Plaintiffs' Exhibit 12, Kroening and Donaldson, *Proposed Mechanisms of Acupuncture*, SAAD Digest, Volume IV, No. 2, April 1979, at 28. None of them, however, adequately explain all of acupuncture's manifestations. *Id.* According to Dr. Richard Kroening, Medical Director of the Pain Management Clinic at the UCLA School of Medicine and Chairman of the Acupuncture Advisory Committee of the California Board of Medical Quality Assurance, who is intimately familiar with both the theory and practice of acupuncture, the explanation most widely accepted by the Western medical community is that acupuncture triggers the production by the pituitary gland of the body's own natural pain-killing substances, endorphins and enkephalins, through so-called "mor-

phine receptors" in the mid-brain. But even "[t]he endorphin system, although possibly explaining many of the mechanisms of acupuncture, does not account for the specificity of acupuncture since a neurohumoral response might be expected to produce a generalized effect." *Id.* at 31. Whatever the best explanation is for how acupuncture works, one thing is clear: it does work.[19] All of the evidence put before this Court indicates that, when administered by a skilled practitioner[20] for certain types of pain and dysfunctions,[21] acupuncture is both safe[22] and effective.[23]

### THE RIGHT OF PRIVACY

In order to evaluate the plaintiffs' claim, it is first necessary to determine whether the interest they seek to protect is of constitutional dimension. The plaintiffs contend that they have a constitutional right, en-

---

although referred to as "negative" and "positive," are equally desirable. Second, as Doctor of Traditional Chinese Medicine Yee-Kung Lok noted at trial, it allows us to understand why acupuncture treatment often proves effective when performed far from the source of discomfort. When a light is not working, one does not always replace the bulb. Sometimes one fixes the wire.

18. One such theory, that acupuncture is simply a placebo, was conclusively disproved by the testimony of Dr. Norman Ralston, a Dallas veterinarian. Doctor Ralston testified that he uses acupuncture for a variety of ailments on 15% of the animals he treats. Of those animals, 92% exhibit total recovery. Dr. Ralston showed slides, Plaintiffs' Exhibit 20, which pictured a number of these animals before, during, and after treatment. Although the problems for which they were treated ranged from cataracts to paralysis to skin disease, each of the animals demonstrated marked improvement. Although the response of humans to acupuncture treatment is undoubtedly partly attributable to a placebo effect, the response of these animals is not. It is both a testament to acupuncture's effectiveness and an undisputable refutation of the theory that acupuncture is nothing more than a placebo.

19. To say that acupuncture works is not, of course, to say that it is 100% effective. According to Dr. Kroening and Doctor of Traditional Chinese Medicine Yee-Kung Lok, acupuncture, even when properly administered, is only effective in treating certain diseases or dysfunction. *See* note 21 *infra*. Furthermore, the doctors testified, even on those diseases

and dysfunctions, acupuncture treatment is not successful in 100% of the cases. Few medical treatments, it was noted, if any, are that successful.

20. As the undisputed testimony of Dr. Kroening, a physician, and Doctor of Traditional Chinese Medicine Yee-Kung Lok, a nonphysician, established that both are skilled practitioners of acupuncture, the class of skilled practitioners includes both physicians and nonphysicians.

21. According to the undisputed testimony of Dr. Kroening, Doctor of Traditional Chinese Medicine Yee-Kung Lok, and assistant acupuncturist Peter Lok, the ailments effectively treated by acupuncture include migraine headaches, arthritis, cataracts, trigeminal neuralgia, whiplash, asthma, and certain types of pain, paralysis, and respiratory diseases.

22. Acupuncture needles can, of course, be used to hurt people and even the most skilled practitioner's hand may slip. The undisputed testimony of Dr. Kroening, Doctor of Traditional Chinese Medicine Yee-Kung Lok, and assistant acupuncturist Peter Lok established, however, that when properly administered by a skilled practitioner, acupuncture results in virtually no side effects or complications.

23. Although not necessary to the Court's ruling in this case, *see* p. 28 *infra*, this fact could be no more clearly established if admitted pursuant to Fed.R.Civ.P. 36(b). There was simply no evidence to the contrary introduced.

compassed by the right of privacy, to decide to obtain or reject medical treatment. That right, they say, protects their decision to obtain acupuncture treatment.

 "The Constitution," of course, "does not explicitly mention any right of privacy. In a line of decisions, however going back . . . as far as *Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891),[24] the [United States Supreme] Court has recognized that a right of personal privacy, or a guarantee of certain zones of privacy, . . does exist." *Roe v. Wade*, 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973) (footnote added). That right is "one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Carey v. Population Services International*, 431 U.S. 678, 684, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977).[25] As "an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life," *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 426 (1977), it encompasses those interests "that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty.' *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)." *Roe v. Wade, supra.* One such interest is "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977).

[A]mong the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage, *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); procreation, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541–542, 62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655 (1942); contraception, *Eisenstadt v. Baird*, 405 U.S. [438], 453–454, 92 S.Ct. 1029, 1038–1039, 31 L.Ed.2d 349; *id.* at 460, 463–465, 92 S.Ct. at 1040, 1043, 1044 (White, J., concurring in result); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); and child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, [262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)]." *Roe v. Wade, supra*, 410 U.S. at 152–153, 93 S.Ct. at 726–727. *See also Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640, 94 S.Ct. 791, 796–797, 39 L.Ed.2d 52 (1974).

*Carey v. Population Services International, supra*, 431 U.S. at 684–685, 97 S.Ct. at 2016. *See also Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976) (decisions relating to one's personal appearance).

 "[T]he outer limits of this aspect of privacy have not been marked by the Court." *Carey v. Population Services International, supra*, 431 U.S. at 684, 97 S.Ct. at 2016. The Court has sought, however, to assure that the list of decisions encompassed by the right of privacy, like the "liberty" protected by the Due Process Clause,

is not a series of isolated points pricked out in terms of the [Bill or Rights, but] a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints . . . and which also rec-

---

**24.** It was in *Union Pacific R. Co. v. Botsford, supra*, at 251, 11 S.Ct. at 1001, decided almost ninety years ago, that the Supreme Court first acknowledged the preeminence of the right of privacy in the hierarchy of constitutional values:

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley: "The right to

one's person may be said to be a right of complete immunity; to be let alone."

Since that time, the importance of this right remains unchallenged and undiminished.

**25.** Parts I, II, III, and V of Justice Brennan's opinion in *Carey v. Population Services International, supra*, constitute the opinion of the Court. *See id.* at 691 n.12, 97 S.Ct. at 2019 n.12. All citations to *Carey v. Population Services International* in the text of this memorandum and order are to those parts of that opinion.

ognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgement.

*Poe v. Ullman,* 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting) (citations omitted). To the extent that the Court has succeeded in that endeavor, it has done so by establishing that the decisions which will be recognized as among those "that an individual may make without unjustified government interference," *Carey v. Population Services International, supra,* 431 U.S. at 685, 97 S.Ct. at 2016, must meet two criteria. First, they must be "personal decisions." *Id.* They must primarily involve one's self or one's family. Second, they must be "important decisions." *Id.* at 684, 97 S.Ct. at 2015. They must profoundly affect one's development or one's life. Although these criteria are not expressed as such in *Carey v. Population Services International, supra,* they can be found in its language. *Id.* at 684–685, 97 S.Ct. at 2015–2016. Moreover, they are implicit in all of the Court's privacy decisions.[26] For example, in *Eisenstadt v. Baird, supra,* 405 U.S. at 453, 92 S.Ct. at 1038 (footnote added), the Court emphasized the first criterion by italicizing the word, "individual" in the following sentence:

> If the right of privacy means anything, it is the right of the *individual,* married or single, to be free of unwarranted govern-

mental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.[27]

Similarly, in *Roe v. Wade, supra,* 410 U.S. at 153, 93 S.Ct. at 727, the Court focused on the second criterion. The right of privacy, it wrote:

> is broad enough to encompass a woman's decision whether or not to terminate her pregnancy. The detriment that the State would impose upon the pregnant woman by denying this choice altogether is apparent. Specific and direct harm medically diagnosable even in early pregnancy may be involved. Maternity, or additional offspring, may force upon the woman a distressful life and future. Psychological harm may be imminent. Mental and physical health may be taxed by child care. There is also the distress, for all concerned, associated with the unwanted child, and there is the problem of bringing a child into a family already unable, psychologically and otherwise, to care for it. In other cases, as in this one, the additional difficulties and continuing stigma of unwed motherhood may be involved.

*See also Kelley v. Johnson, supra,* 425 U.S. at 250–253, 96 S.Ct. at 1447–1449 (Marshall, J., dissenting) (discussing personal and important nature of decisions relating to one's appearance).

■ The decision to obtain or reject medical treatment, no less than the decision to continue or terminate pregnancy, meets

---

**26.** As the right of privacy is implicit throughout the Bill of Rights, *see Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), it is not surprising that these criteria are also expressed in cases not generally considered to be privacy cases. Thus, in *Faretta v. California,* 422 U.S. 806, 834, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562, the Court upheld the right of a criminal defendant to decide to proceed without counsel by stating:

> The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the

individual which is the lifeblood of the law." *Illinois v. Allen,* 397 U.S. 337, 350–351, 90 S.Ct. 1057, 1064–1065, 25 L.Ed.2d 353 (Brennan, J., concurring).

Note, also, that the Court recognized that the right to make this decision, like the right to decide whether to terminate pregnancy, *see Roe v. Wade, supra,* 410 U.S. at 154–156, 93 S.Ct. at 727–728 and the right to make the decision involved in the present case, *see* pp. 26, 34–35 *infra,* is not absolute. *Faretta v. California, supra,* 422 U.S. at 834 n.46, 95 S.Ct. at 2541 n.46.

**27.** Had the Court desired to emphasize the second criterion in that case, it could have italicized the phrase, "so fundamentally affecting a person," in the same sentence.

both criteria. First, although decisions "relating to marriage, procreation, contraception, family relationships, and child rearing and education," *Roe v. Wade, supra*, 410 U.S. at 152–153, 93 S.Ct. at 726 (citations omitted); *Carey v. Population Services International, supra*, 431 U.S. at 685, 97 S.Ct. at 2016 (citations omitted), often involve and affect other individuals as directly as they do one's self, decisions relating to medical treatment do not. They are, to an extraordinary degree, intrinsically personal. It is the individual making the decision, and no one else, who lives with the pain and disease. It is the individual making the decision, and no one else, who must undergo or forego the treatment. And it is the individual making the decision, and no one else, who, if he or she survives, must live with the results of that decision. One's health is a uniquely personal possession. The decision of how to treat that possession is of a no less personal nature.

Second, it is impossible to discuss the decision to obtain or reject medical treatment without realizing its importance. The decision can either produce or eliminate physical, psychological, and emotional ruin. It can destroy one's economic stability. It is, for some, the difference between a life of pain and a life of pleasure. It is, for others, the difference between life and death.

The particular treatment decision involved in the present case, the decision to obtain acupuncture, is of equally substantial import.[28] To begin with, many individuals, including plaintiff John Walter, seek acupuncture only after Western medical techniques have failed them. Doctor Yee-Kung Lok, a Doctor of Traditional Chinese Medicine and Master Acupuncturist who presently practices in Nevada and is Chairman of the Advisory Committee to that state's Board of Oriental Medicine, testified that over ninety percent of his patients have previously been treated without success by Western doctors. For these individuals, acupuncture constitutes a last hope. Denied the right to choose acupuncture, they are condemned either to endure without hope the misery that is theirs or to continue to expend their energies and resources on treatment that brings them no relief. The choice is no less important for those who would choose acupuncture over Western medical techniques.[29] The alternative Western treatment, whether drugs or surgery, may involve a serious risk of side effects or injury. For example, a person suffering from severe lower back pain may, denied the choice of acupuncture, be forced to undergo a spinal fusion and risk becoming a virtual invalid for life. Having heard the testimony of plaintiff John Walter, whose suffering and pain brought him to his "wit's end," and having seen the videotaped records of five patients of Dr. Yee-Kung Lok, Plaintiffs' Exhibit 1, this Court can only conclude that the decision to obtain acupuncture is one "fundamentally affecting a person." *Eisenstadt v. Baird, supra*, 405 U.S. at 453, 92 S.Ct. at 1038. *See also Record of Thompson v. Texas State Board of Medical Examiners*, at 65–94 (testimony of Karl Kuby), 95–103 (testimony of Herbert Stehberg), 104–128 (testimony of Betty Evajean Montgomery), 297–333 (testimony of Wallace H. Yates).[30] One's health is perhaps one's most valuable asset. The importance of decisions affecting it cannot be overstated.

---

28. Although treatment decisions are almost always personal ones, not all are necessarily important enough to be encompassed by the right of privacy. *See Minnesota State Board of Health v. City of Brainerd*, 308 Minn. 24, 241 N.W.2d 624, 632 (Minn. 1976) ("While forced fluoridation does intrude on an individual's decision whether or not to ingest fluoride, the impact of this intrusion on an individual's life is negligible.")

29. Because it is so safe a procedure, when administered by skilled practitioners, *see* note

22 *supra*, and because it is more effective on individuals who have not undergone surgery, the UCLA Acupuncture Research Project recommends "a trial of at least 10 acupuncture treatments *prior* to the implementation of surgery for musculo-skeletal pain." Plaintiff's Exhibit 16, Bresler, Katz, and Kroening, *Review of Research Findings of the UCLA Acupuncture Research Project*, December 1, 1975, at 3 (emphasis in original).

30. *See* note 10 *supra*.

Thus, the decision to obtain or reject medical treatment, presented in the instant case as the decision to obtain acupuncture treatment, is both personal and important enough to be encompassed by the right of privacy. This should come as no surprise. To begin with, the Fifth Circuit held over twenty-one years ago that "the State cannot deny to any individual the right to exercise a reasonable choice in the method of treatment of his ills." *England v. Louisiana State Board of Medical Examiners*, 259 F.2d 626, 627 (5th Cir. 1958) (emphasis deleted), *rehearing denied*, 263 F.2d 661 (written opinion), *cert. denied*, 359 U.S. 1012, 79 S.Ct. 1149, 3 L.Ed.2d 1036 (1959). In addition, Chief Justice Burger, while a Circuit Judge for the District of Columbia, included the choice of "refusing medical treatment even at great risk" among those encompassed by the right of privacy.[31] *Application of President and Directors of Georgetown College, Inc.*, 331 F.2d 1010, 1017 (D.C. Cir. 1964) (denying rehearing en banc) (dissenting opinion). And Justice Douglas, in *Doe v. Bolton*, 410 U.S. 179, 213, 93 S.Ct. 739, 758, 35 L.Ed.2d 201 (1973) (concurring opinion), stated that the "right of privacy" included "the freedom to care for one's health and person."[32] Moreover, it is the inalienable nature of the right to decide to obtain or reject medical treatment which forms the very basis of the requirement, enforced throughout America, that medical practitioners obtain their patients' informed consent prior to administering treatment. "The root premise is the concept, fundamental in American jurisprudence, that '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body.' [*Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92, 93 (1914) (Cardozo, J.)]." *Canterbury v. Spence*, 464 F.2d 772, 780 (D.C. Cir. 1972).[33] Finally, to the knowledge of this Court, since *Roe v. Wade, supra*, thirteen different courts in ten different jurisdictions have, in the absence of controlling decisions, directly addressed the question of whether the right to privacy encompasses the decision to obtain or reject medical treatment. *Wensel v. Washington, supra* note 2, at 1159–1160 (Superior Court of the District of Columbia, Civil Division); *Matter of Quinlan*, 137 N.J. Super. 227, 348 A.2d 801, 821–822 (Super.Ct.

---

**31.** In perhaps the most famous statement of the right to privacy, Justice Brandeis said in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 914 (1928) (dissenting opinion):

> The makers of our Constitution . . . sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

*Application of President and Directors of Georgetown College, Inc., supra*, involved the administering of a blood transfusion to a patient who refused to accept it on religious grounds. Referring to Justice Brandeis's dissent in *Olmstead, supra*, Circuit Judge Burger wrote:

> Nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to *sensible* beliefs, *valid* thoughts, *reasonable* emotions, or *well-founded* sensations. I suggest he intended to include a great many foolish, unreasonable and even absurd ideas which do not conform, such as refusing medical treatment even at great risk.

*Application of President and Directors of Georgetown College, Inc., supra*, at 1017 (Burger, J., dissenting).

**32.** It was also in *Doe v. Bolton, supra*, 410 U.S. at 200, 93 S.Ct. at 751, that the Court included "medical treatment" among the privileges protected by the Privileges and Immunities Clause. *See Baldwin v. Fish & Game Commission of Montana*, 436 U.S. 371, 98 S.Ct. 1852, 1869, 56 L.Ed.2d 354 (1978) (Burger, C. J., dissenting). For a comment on the degree to which the Constitution protects decisions to obtain medical treatments other than abortion, *see Sendak v. Arnold*, 429 U.S. 968, 969, 97 S.Ct. 476, 477, 50 L.Ed.2d 579 (1976) (dissenting opinion), wherein Justice White says, "[s]o far as I can tell, [*Roe v. Wade, supra*, and *Doe v. Bolton, supra*] do not elevate the decision to have an abortion to a higher constitutional status than the decision to have life-saving or health-preserving operations."

**33.** That concept is just one expression of the basic tenet that, "outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases." *Kent v. Dulles*, 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958).

Wensel v Wash (Super Ct DC, Civ Div 1975)
reprinted in Lewis v DC Comm'n on Licensure to Practice The Healing Art 385 A2d 1148 (DC 1978)

Civ.Div. 1975), *modified*, 70 N.J. 10, 355 A.2d 647, 662–663 (N.J. 1976) (Superior Court of New Jersey, Chancery Division, and Supreme Court of New Jersey); *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905, 910–912 (1976) (Supreme Court of Minnesota); *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 424 (1977) (Supreme Judicial Court of Massachusetts); *Rutherford v. United States*, 438 F.Supp. 1287, 1298–1301 (W.D. Okl.), *affirmed on other grounds*, 582 F.2d 1234 (10th Cir. 1978), *reversed on other grounds*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979), *reversed*, 616 F.2d 455 (10th Cir. 1980), *rehearing denied* (April 28, 1980) (United States District Court for the Western District of Oklahoma and United States Court of Appeals for the Tenth Circuit) [34]; *People v. Privitera*, 74 Cal.App.3d 936 (Ct. App. 1978), *reprinted in People v. Privitera*, 23 Cal.3d 697, 153 Cal.Rptr. 431, 439, 591 P.2d 919, 927 (1979) (Bird, C. J., dissenting), *reversed*, 153 Cal.Rptr. 431, 433–435, 591 P.2d 919, 921–923 (Cal. 1979) (Court of Appeals of California and Supreme Court of California, En banc); *Satz v. Perlmutter*, 362 So.2d 160, 162–163 (Fla. Dist. Ct. App. 1978) (District Court of Appeal of Florida, Fourth District); *Rennie v. Klein*, 462 F.Supp. 1131, 1144–1145 (D. N. J. 1978) (United States District Court for the District of New Jersey); *Rogers v. Okin*, 478 F.Supp. 1342, 1365–1366 (D. Mass. 1979) (United States District Court for the District of Massachusetts); *In re Eichner*, 73 A.D.2d 431, 456–460, 423 N.Y.S.2d 517, 537–540 (1980) (New York Supreme Court, Appellate Division, Second Judicial Department). Of these, all but two, *see Wensel v. Washington, supra* note 2, at 1159–1160,[35] and *People v. Privitera, supra*, 153 Cal.Rptr. at 433–435, 591 P.2d at 921–923 [36] responded

**34.** *Rutherford v. United States, supra*, a class action by terminal cancer victims seeking to obtain laetrile treatment, is still being litigated. In the most recent opinion issued, the Tenth Circuit ruled against the plaintiffs, stating that, "the decision by the patient whether to have a treatment or not is a protected right, but his selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health." *Rutherford v. United States*, 616 F.2d at 457 (10th Cir. Feb. 19, 1980), *rehearing denied* (April 28, 1980). This distinction is a difficult one to support, particularly where, as with laetrile, to deny the particular treatment involved may be to deny the decision to have treatment. The court gave no explanation for it. The outcome of the case, if correct, was proper not because the plaintiffs had no right to decide to obtain laetrile, but because the ban on laetrile was "narrowly drawn" to achieve the "compelling state interest," *Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. at 728, in protecting the health and safety of cancer patients. *See* n.40 *infra*.

**35.** *Wensel v. Washington, supra* note 2, was, as best this Court can tell, the first case after *Roe v. Wade, supra*, to address the question. It involved a challenge to a District of Columbia regulation which, like the articles and rules in the present case, limited the practice of acupuncture to licensed physicians. Although the court declined to recognize the decision to obtain medical treatment as one protected by the right of privacy, it did speak of the "plaintiff patients' right to receive medical treatment as dictated by their personal physicians." *Id.* at 1167. Furthermore, it held the regulation "unconstitutional on the basis that it lack[ed] a rational relationship to a proper legislative purpose." *Id.* at 1173 n.7. It should be noted that the precise argument adopted in *Wensel v. Washington, supra*, "that physicians have the right to evaluate the needs of their patients and prescribe a reasonable mode of medical care without state interference, absent a clear and reasonable public need," *id.* at 1173, was not presented to this Court. Although Texas physicians have undoubtedly been restricted in their ability to prescribe acupuncture treatment for their patients, *see* pp. 1050–1052 *supra*; *Thompson v. Texas State Board of Medical Examiners, supra*; there was no evidence put before this Court that the plaintiffs' physicians have prescribed acupuncture treatment for them.

**36.** *People v. Privitera, supra*, like *Rutherford v. United States, supra*, involved a challenge to laws limiting access to laetrile. Unlike the court in the latter case, however, the majority in *Privitera* refused to acknowledge that the right of privacy encompasses the decision to obtain or reject medical treatment. In so doing, it relied heavily on the recognition in *Roe v. Wade, supra*, 410 U.S. at 153 154, 93 S.Ct. at 726 727, that the right of privacy is not absolute. *Privitera, supra*, 153 Cal.Rptr. at 434, 591 P.2d 922. That recognition, however, says nothing about whether the right of privacy encompasses a particular decision. Although not absolute, the right of privacy includes the decision "whether or not to terminate . . . pregnancy." *Roe v. Wade, supra*, 410 U.S. at 153, 93 S.Ct. at 727. It similarly includes the decision whether or not to obtain medical treatment.

in the affirmative.[37] Thus, this Court is merely joining the clear trend of modern authority in acknowledging that the decision to obtain or reject medical treatment,

> The majority in *Privitera* went on to hold that "when danger to health exists . . . state regulation shall be tested under the *rational basis* standard," *id.*, 153 Cal.Rptr. at 434, 591 P.2d at 922 (emphasis in original), and stated that *Roe v. Wade, supra, Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), support that holding. They do not. The Court in *Roe v. Wade* recognized that the right to privacy encompassed the decision to obtain an abortion. This right was, of course, not absolute. Even in the first trimester of pregnancy, the State could require that abortions be performed by licensed physicians, *id.* 410 U.S. at 165, 93 S.Ct. at 732, because abortions so performed were safer than childbirth. *Id.* at 149, 93 S.Ct. at 724; *Connecticut v. Menillo,* 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975). And, in the second trimester, the State could "regulate the abortion procedure in ways that [were] reasonably related to maternal health," *id.* 410 U.S. at 164, 93 S.Ct. at 732, because the State's interest in protecting the health of the mother reached the "compelling point" at the end of the first trimester. *Id.* at 163, 93 S.Ct. at 731. In neither trimester, however, could the State significantly burden the woman's right to decide to obtain an abortion. The choice was hers. A regulation denying it not only had to be motivated by a "compelling state interest," it had to be "narrowly drawn" to express only that interest. *Id.* at 155 -156, 93 S.Ct. at 727 728, and cases cited therein.
>
> *Planned Parenthood of Central Missouri v. Danforth, supra,* involved among other things, a challenge to provisions prohibiting "the use of saline amniocentesis, as a method or of abortion, after the first 12 weeks of pregnancy . . . on the ground that it operates to preclude virtually all abortions after the first trimester." *Id.* 428 U.S. at 75 76, 96 S.Ct. at 2844. It was, of course, entirely reasonable to assume, as Justice White argued in dissent, *id.* at 98 99, 96 S.Ct. at 2854-2855; that prohibition of saline would cause such a demand for prostaglandin that the latter would be made immediately available, but the Court refused to uphold the saline ban. Although part of the "opinion of the Court," *id.* at 55, 96 S.Ct. at 2834, Justice Blackmun's discussion of the saline ban, phrased in terms of "reasonableness," *see id.* at 79, 96 S.Ct. at 2845, was joined in by only three of his brethren. The determinative opinion, written by Justice Stevens, with Justices Stewart and Powell concurring, *see id.* at 89--92, 96 S.Ct. at 2850 2852 (Stewart, J., with whom Powell, J., joins, concurring), viewed the issue from the proper perspective:
>> [T]he record indicates that when the Missouri statute was enacted, a prohibition of the saline amniocentesis procedure was almost tantamount to a prohibition of any abortion in the State after the first 12 weeks of pregnancy. Such a prohibition is *inconsistent with the essential holding of Roe v. Wade* and therefore cannot stand.
>
> *Id.* at 102, 96 S.Ct. at 2856 (Stevens, J., concurring in part and dissenting in part) (emphasis added). In other words, the saline ban was unconstitutional because, as the Court reaffirmed six months later in *Carey v. Population Services International, supra,* 431 U.S. at 686, 97 S.Ct. at 2016, "where a decision as fundamental as that whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests. [*Roe v. Wade, supra,*] 410 U.S. at 155 156, 93 S.Ct. at 727 728 and cases there cited."
>
> *Whalen v. Roe, supra,* involved a challenge to a New York law which required that a copy of every prescription filed for certain drugs be provided to the State. Justice Stevens, writing for the Court, held that the effect of the requirement on treatment decisions was so small that the statute simply did not "constitute an invasion of any right or liberty protected by the Fourteenth Amendment." *Id.* at 603 604, 97 S.Ct. at 878. The requirement, therefore, only had to meet the rational basis test. *Id.* at 597 598, 97 S.Ct. at 875 876. Thus, *Whalen v. Roe* establishes that, when no fundamental right is infringed and a "danger to health exists . . . state regulation shall be tested under the *rational basis* standard." *People v. Privitera, supra,* 153 Cal.Rptr. at 591 P.2d at 922. But, contrary to the holding in *Privitera,* when a fundamental right is infringed, *Roe v. Wade, Planned Parenthood of Central Missouri v. Danforth,* and *Carey v. Population Services International* establish that whether or not a danger to health exists, state regulation shall be tested under the *compelling state interest* standard. The outcome in *Privitera,* if correct, was proper not because the plaintiffs had no right to decide to obtain laetrile, but because the ban on laetrile was "narrowly drawn" to achieve the "compelling state interest," *Roe v. Wade, supra,* 410 U.S. at 155, 93 S.Ct. at 728, of protecting the health and safety of cancer patients. *See* n.40 *infra.*

**37.** *See also Suenram v. Society of the Valley Hospital,* 155 N.J.Super. 593, 383 A.2d 143 (Super. Ct. N. J. 1977) (right of privacy recognized in *Matter of Quinlan, supra,* includes decision to obtain laetrile); *Rogers v. State Board of Medical Examiners,* 371 So.2d 1037 (Fla. Dist. Ct. App. 1979) (Florida Constitution protects decision to obtain chelation treatment); *Goedecke v. State Department of Institutions,* 603 P.2d 123 (Colo. 1979) (Colorado recognizes statutory and common law right to refuse

consisting in the instant case of the decision to obtain acupuncture, is protected by the right of privacy.

## THE DENIAL OF THE RIGHT OF PRIVACY

■ To recognize that the decision to obtain acupuncture treatment is encompassed by the right of privacy is not, of course, to end the inquiry. The Court must next determine whether the challenged articles and rules effectively deny the right of privacy by "imposing a burden on," *Carey v. Population Services International, supra,* 431 U.S. at 686, 97 S.Ct. at 2016, or "significantly interfer[ing] with," *Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S.Ct. 673, 682, 54 L.Ed.2d 618 (1978), the decision in question.[38] If they do not, then they only need be "rationally related" to a "constitutionally permissible" purpose to pass constitutional muster. *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972). If they do, they must be "narrowly drawn" to a "compelling state interest," *Roe v. Wade, supra,* 410 U.S. at 155–156, 93 S.Ct. at 727–728, and cases cited therein, in order to withstand constitutional scrutiny.

■ There can be little doubt that the articles and rules challenged in the present case "impos[e] a burden on," *Carey v. Population Services International, supra,* and "significantly interfere[ ] with," *Zablocki v. Redhail, supra,* the decision to obtain acupuncture treatment. Plaintiff John Walter testified that he was unable to find a single licensed physician in the state of Texas who was skilled in the practice of acupuncture. Doctor Yhi-Min Ho, President of the American Association of Concerned Chinese-

American Professionals and Acting Dean of the Business School and Chairman of the Economics Department at St. Thomas University, similarly stated that acupuncture was substantially unavailable in Houston. Doctor Max Butler, President of the Texas State Board of Medical Examiners, the agency which promulgated Rules 386.01.12.-001–.002 and is primarily responsible for the enforcement of the Medical Practice Act, *see Tex.Rev.Civ.Stat.Ann.* art. 4495, was called by the defense to respond. Although fully aware that the instant case was being litigated and that he was likely to be called as a witness, Dr. Butler was unable to name one licensed physician presently practicing acupuncture in Texas. He did testify that acupuncture had been available at the M. D. Anderson Clinic in Houston, but admitted that he did not know whether acupuncture was still offered there. Dr. William Derrick, an eminent Houston anesthesiologist also called by the defense, testified that it was not. Texas medical schools, it should be noted, do not presently offer formal training in either the theory or practice of acupuncture.

The stipulated testimony of Dr. M. T. Jenkins, a distinguished Dallas anesthesiologist associated with the University of Texas Southwest Medical School, revealed that several physicians were performing acupuncture at that institution in 1976 after having learned it from books, Defendants' Exhibit 5, at 209, or from six-week tours of Taiwan. *Id.* at 197. Whether or not such physicians can be considered skilled in the practice of acupuncture, there was no testimony that either they or any other physicians from that institution continue to administer acupuncture treatment in Texas. Only one witness, Dr. Derrick, offered the name of a specific licensed physician cur-

medical treatment); *In re Boyd,* 403 A.2d 744, 750 (D.C. 1979) (Court is to follow choice incompetent would have made, if competent, regarding medical treatment, "whether religious preference or other factors are involved, for [that] is the only way to pay full respect to the individuality and dignity of a person.")

**38.** Although the language used in different opinions varies, the Court's decisions clearly establish that when action, as opposed to inac-

tion, *see Maher v. Roe,* 432 U.S. 464, 475, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977), by the State directly interferes with the individual's right to make a protected decision, it "may be justified only by compelling state interests, and must be narrowly drawn to express only those interests." *Carey v. Population Services International, supra,* 431 U.S. at 686, 97 S.Ct. at 2016.

rently practicing acupuncture in the State. The name Dr. Derrick offered was that of Dr. Benjamin Mo. Plaintiff John Walter, however, specifically testified that he would not trust his welfare to Dr. Mo, as he considered Dr. Mo to be unskilled in the practice of acupuncture. Moreover, Dr. Mo was present in the courtroom and available to testify throughout much of the trial, but was not called as a witness. As the Supreme Court said in *Interstate Circuit v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939) (citation omitted), "[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character." The failure to call Dr. Mo, combined with the inability of the defendants to produce a single licensed physician presently practicing in Texas who either administers acupuncture or claims expertise in its theory or practice, fully supports the claims of the plaintiffs. This court can only conclude that the challenged articles and rules effectively render acupuncture treatment unavailable in the State of Texas. In practical terms, they not only "burden an individual's right to decide [to obtain acupuncture treatment] by substantially limiting access to the means of effectuating that decision," they essentially "prohibit the decision entirely." *Carey v. Population Services International, supra*, 431 U.S. at 688, 97 S.Ct. at 2018.

## THE OFFERED JUSTIFICATIONS

The fact that the articles and rules in question effectively deprive the plaintiffs of their right to decide to obtain acupuncture treatment does not necessarily, as has been discussed, render them constitutionally infirm. The right of privacy is not absolute. *Roe v. Wade, supra*, 410 U.S. at 154, 93 S.Ct. at 727. It may be overcome if the articles and rules being challenged are both

motivated by a "compelling state interest" and "narrowly drawn to express only" that interest. *Id.* at 155, 93 S.Ct. at 728; *Carey v. Population Services International, supra*, 431 U.S. at 686, 97 S.Ct. at 2016. In the present case, the plaintiffs concede that the former requirement is met. *Plaintiffs' Post-trial Brief*, at 10. *Roe v. Wade, supra*, 410 U.S. at 162–163, 93 S.Ct. at 731–732, establishes that the State's "interest in preserving and protecting the health of the [patient]" may be a "compelling" one. The question here is whether the State's regulations meet the latter requirement. To do so, they must be "necessary," *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969), to the protection of the patient's health. As the Supreme Court carefully explained in *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) (footnote added):

It is not sufficient for the State to show that [the articles and rules in question] further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963); *United States v. Robel*, 389 U.S. 258, 265, 88 S.Ct. 419, 424, 19 L.Ed.2d 508 (1967), and must be "tailored" to serve their legitimate objectives. *Shapiro v. Thompson, supra*, 394 U.S., at 631, 89 S.Ct. at 1329. And if there are other reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means." *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960).[39]

**39.** Although *Dunn v. Blumstein, supra*, and many of the cases cited therein are Equal Protection Clause cases, the Court has not distinguished the standard to be applied to regulations which interfere with the right of privacy under the Due Process Clause from that to be

applied to regulations which interfere with "fundamental interests" under the Equal Protection Clause. *See Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. at 728 (privacy case relying on Equal Protection Clause cases); *Zablocki v. Redhail, supra*, 434 U.S. at 388, 98

Although the challenged provisions of the Medical Practice Act would, by their terms, restrict the practice of acupuncture to licensed physicians whatever its safety and effectiveness, the challenged rules, it is important to note, are presumably based upon a finding that "[a]cupuncture is an experimental procedure, the safety [and effectiveness] of which [have] not been established." Tex. St. Bd. of Med. Exam. Rule 386.01.12.-001(c). There are a number of problems with this finding. To begin with, it appears to have been based on no evidence. Doctor Butler testified that the Board of Medical Examiners neither has members who are experts on the theory or practice of acupuncture nor heard testimony by or received evidence from any such experts. Moreover, acupuncture has been practiced for 2000 to 5000 years. It is no more experimental as a mode of medical treatment than is the Chinese language as a mode of communication. What is experimental is not acupuncture, but Westerners' understanding of it and their ability to utilize it properly. Finally, as has been discussed, see p. 1044 supra, all of the evidence adduced before the Court indicates that acupuncture, when administered by a skilled practitioner for certain types of diseases and dysfunctions, is both a safe and effective form of medical treatment. This Court however, need not decide whether the Board's "finding" can be supported. Assuming arguendo that acupuncture is an experimental proce-

dure of unproven safety and effectiveness, this Court must still determine whether the physician-only limitation is "narrowly drawn" to the State's "compelling interest" in protecting the patient's health. Roe v. Wade, supra, 410 U.S. at 155, 93 S.Ct. at 728. If it is not, then it must be invalidated.[40]

The defendants argue that the limitation of the practice of acupuncture to licensed physicians serves the State's interest in preserving the patient's health in three ways. The first is that it protects against misdiagnoses. Neither patients nor nonphysicians in general, the defendants contend, are as skilled as physicians in diagnosing injuries and illnesses. Thus, the argument goes, it is entirely possible that an individual suffering from cancer would obtain acupuncture treatment for the related pain and that the cancer would continue to spread, undetected by both the patient and the acupuncturist, until it was too late. By requiring that the acupuncturist actually be a licensed physician, the defendants say, the challenged articles and rules help to prevent this situation from occurring. The licensed physician, being trained to recognize the signs of cancer, is more likely to accurately diagnose the disease and arrange for the patient to be treated properly.

Whether or not the specific scenario envisioned by the defendants is likely to occur,[41]

S.Ct. 682 (Equal Protection Clause case relying on Due Process Clause case).

**40.** The safety and effectiveness of a given medical treatment will, of course, influence what regulations are necessary to protect the patient's health. If a particular treatment, for example, is so unsafe and ineffective as to constitute a positive danger to those using it, a ban of the treatment would, presumably, be "narrowly drawn" to the protection of the patient's health. That was the argument made of laetrile. See Custody of a Minor, —— Mass. ——, at —— – ——, 393 N.E.2d 836, Mass. Adv. Sh. 2124 (Mass. August 9, 1979) (Chad Green case). It is not the argument made of acupuncture. The State, for rather obvious factual reasons, see p. 1044 supra, does not contend that acupuncture is so unsafe or ineffective as to constitute a danger to those receiving it. It contends that acupuncture's safety and effectiveness have not been fully established. The

question, then, is not whether acupuncture is experimental or safe or effective. The question is whether the challenged articles and rules are "narrowly drawn" to protect the patient from the dangers the State associates with acupuncture's usage.

**41.** Both Dr. Yee-Kung Lok and his son, Peter Lok, an assistant acupuncturist, testified that acupuncture will not mask cancer-related pain. Acupuncture, they said, works on the causes of pain, rather than on pain itself. It cannot eliminate cancer-related pain because it cannot eliminate cancer. This testimony is corroborated by the failure of the research project on acupuncture treatment of cancer-related pain conducted by the M. D. Anderson Clinic in the mid-1970's. The plaintiffs, however, attributed the failure of that project, to the lack of skill of the individuals administering the acupuncture, not to the ineffectiveness of acupuncture in relieving cancer-related pain.

it is possible that the physician-only limitation serves to prevent misdiagnoses. That limitation is not, however, "*necessary*," *Dunn v. Blumstein, supra,* 405 U.S. at 342, 92 S.Ct. at 1003 (emphasis in original), to prevent such occurrences. The State merely need require that patients consult physicians prior to obtaining acupuncture treatment. At least one state does precisely that. California law provides that acupuncture "not be performed on a person without prior diagnosis or referral from a licensed physician." *Cal. Business & Professions Code* § 2155. Texas law could do the same. It could, in other words, prevent misdiagnoses by "less drastic means." *Shelton v. Tucker, supra.*

The second way in which the physician-only requirement arguably serves to protect patients is by assuring that acupuncture is administered properly. An acupuncture needle in unskilled hands can cause serious damage.[42] Physicians, the defendants point out, are sworn to preserve health. They are, thus, it is argued, less likely than nonphysicians, as a class, to administer acupuncture treatment when they do not know how to safely and effectively do so. Moreover, the defendants say, physicians, as a class, know how the human body works. They are less likely, therefore, than nonphysicians to harm patients through the improper placement of acupuncture needles.

It is rather surprising that the defendants advance this argument. To begin with, the physicians presently practicing in Texas, as a class, are neither skilled nor trained in the practice of acupuncture. Medical schools in Texas do not offer classes in acupuncture; nor is acupuncture knowledge tested in the licensing examinations taken by potential Texas physicians. *See Tex.Rev.Civ.Stat.Ann.* art. 4503. As the defendants recognize, "[a]cupuncture is a recent innovation to most Texans, physicians and laymen alike. . . . [It] is not much more familiar to many doctors now than it was [in 1974]. . . . Most physicians have no basis upon which to evaluate the performance of an acupuncturist." *Defendants' Brief in Support of Motion to Dismiss,* at 5. Moreover, there are individuals—acupuncturists—who do have both training and expertise in acupuncture. They are educated in the basic sciences[43] and the theory and practice of acupuncture. They are taught where and where not to place acupuncture needles.[44] They know, in other words, how to perform acupuncture. Depending upon the illness or injury involved, they may alter the location of the needles, the depth of insertion, the angle of insertion, the period of insertion, the degree of stimulation to be applied to the needles, the angle of that stimulation, and the association of the needles to each other. According to Dr. Kroening and Dr. Lok, such individuals are currently trained, among other places, in Asia, England, France, Germany, Italy, Sweden, California, and Massachusetts. The foreign locales in which they legally practice include those already men-

In related testimony, Dr. Kroening stated that practitioners administering acupuncture at the UCLA Pain Management Clinic discovered four cases of cancer in the 3000 patients they treated which had not been detected by Western physicians. This is not necessarily indicative of the relative diagnostic skills of physicians and acupuncturists, as many of the individuals practicing acupuncture at that clinic were either licensed physicians or Western medical students.

**42.** The longer needles can, of course, be used to puncture any major organ in the body and even the shorter needles can do great harm. According to Dr. Kroening, acupuncture students are trained to avoid using the needles at certain times and in certain areas. They are taught, for example, not to perform acupuncture on infants under the age of one, not to place needles around the heads of older infants, not to place needles in the eyes or the nipples, not to place needles in bleeding sores, abscesses, or tumors, and not to use long needles over the lungs or the stomach. In addition, Dr. Kroening stated that they are trained to avoid certain points when administering acupuncture to pregnant women, as stimulation of those points may cause abortion.

**43.** According to the testimony of Doctor of Traditional Chinese Medicine Yee-Kung Lok, students at the Hong Kong College of Chinese Acupuncture are given 300–500 hours of training in the basic sciences.

**44.** *See* note 42 *supra.*

tioned, Australia, Austria, Canada, Switzerland, and New Zealand. In the United States, research indicates, trained acupuncturists are free to practice independently, upon referral from a licensed physician, or under the supervision of a licensed physician, in Arizona, California, the District of Columbia, Florida, Hawaii, Louisiana, Massachusetts, Montana, Nevada, New York, Oregon, Rhode Island, South Carolina, Tennessee, and Washington.[45]

One such trained acupuncturist, to take an admittedly outstanding example, is Dr. Yee-Kung Lok. Doctor Lok is a Doctor of Traditional Chinese Medicine, a Master Acupuncturist, and, among many other things, past President of the Hong Kong College of Chinese Medicine. *See* Plaintiffs' Exhibit 2. He began his study of acupuncture as a discipline in Shanghai, China, at the age of twelve and currently utilizes well over 1,000 points in acupuncture treatment.[46] In over 40 years of practice, Dr. Lok has never injured a patient, as best can be determined, in any manner. He and his fellow acupuncturists are, it cannot be gainsaid, as a class, more likely to safely and effectively administer acupuncture treatment than are the physicians currently licensed to practice medicine in Texas.

The State, of course, need not allow trained acupuncturists to practice without regulation. As has been noted, it has an interest in assuring that acupuncture is administered properly. Moreover, it is well-advised to protect that interest by assuring that both formally trained and formally untrained practitioners know what they are

doing. That, however, is not what Texas has done. It has prohibited the formally trained from practicing, but has allowed the formally untrained, who it admits "are not schooled enough in acupuncture to effectively supervise acupuncturists," *Defendants' Post-trial Brief*, at 8, to proceed without any showing of skill or knowledge. One court has held that laws limiting the practice of acupuncture to licensed physicians are so ill-conceived that they lack, "a rational relationship to a proper legislative purpose." *Wensel v. Washington, supra* note 2, at 1173 n.7. This Court need not reach that issue. *See* note 2 *supra*. Whether or not such laws are irrational, they cannot be said to be "narrowly drawn," *Roe v. Wade, supra*, 410 U.S. at 155, 93 S.Ct. at 728, to the State's interest in assuring that acupuncture is administered properly.

The third way in which the challenged articles and rules theoretically protect the patient's health is by assuring that any complications which may arise during acupuncture treatment will be remedied as quickly as possible. However safe acupuncture is, the defendants say, it is always possible that something will go wrong. The acupuncturist's hand may slip, an undiagnosed injury or illness may be present, or the patient may simply suffer a heart attack during treatment. The requirement that acupuncturists be licensed physicians, the defendants maintain, insures that whatever complications may arise will be remedied with immediacy.

Although complications appear relatively unlikely to arise from properly administered

**45.** *See Ariz. St. Bd. of Med. Exam. Reg.* 4–16–11; *Cal. Business & Professions Code* §§ 2150–2159; *Wensel v. Washington, supra* note 2; Policy Statement of Florida State Board of Medical Examiners; *Hawaii Rev.Stat.* § 436D–1–13; *La.Rev.Stat.Ann.* §§ 37:1356–37:1360; Deposition Upon Written Questions of Charlotte B. Clautier, Secretary, Massachusetts Board of Registration in Medicine; *Mont.Rev. Codes Ann.* §§ 37–13–101–316; *Nev.Rev.Stat.* §§ 634A.010–.240; *N.Y.Educ.Law* § 6523 Note (McKinney Supp.); *Or.Rev.Stat.* §§ 677.-259–.262; *R.I.Gen.Laws Ann.* §§ 5–37.2–1–22; *S.C.Code* § 40–47–70; *Tenn.Code Ann.* § 63–102; Deposition Upon Written Questions of Joanne Redmond, Assistant Administrator, De-

partment of Licensing of State of Washington. According to the Deposition Upon Written Questions of Hilda Stevan, Administrator of the Maryland State Board of Medical Examiners, regulations authorizing the practice of acupuncture by qualified nonphysicians in that state had been proposed and approved by the Board, but were not in effect as of December 20, 1979.

**46.** To provide some basis for comparison, Dr. Kroening testified that he teaches 160 acupuncture points to medical students learning acupuncture at the UCLA Pain Management Clinic.

acupuncture treatment,[47] the challenged articles and rules do serve to assure that they will be dealt with quickly. The articles and rules are not, however, "tailored," *Shapiro v. Thompson, supra,* to the achievement of that objective. The State has made no effort to determine what type of complications, if any, arise during acupuncture. It has taken no steps to assure that physicians are trained to deal with those types of complications. It has made no determination that other individuals, such as trained acupuncturists, are not equally able to remedy those types of complications. And it has done nothing to prevent such complications from occurring in the first place. There are clearly "less drastic means," *Shelton v. Tucker, supra,* the State could take to avoid the danger involved here. It could require acupuncturists to pass courses in emergency medical treatment. It could require acupuncturists to make arrangements to have emergency medical treatment readily available. Or, if it truly considered the presence of a physician essential, it could enact regulations requiring acupuncturists to assure that their patients have ready access to a physician. The State, however, has not done this. It has required that acupuncturists actually be licensed physicians. Such a requirement is simply not "*necessary, Dunn v. Blumstein, supra* (emphasis in original), to protect the patient from complications.

### THE APPROPRIATE RELIEF

The physician-only limitation is not, it has been seen, "narrowly drawn" to achieve a "compelling state interest." *Roe v. Wade, supra,* 410 U.S. at 155, 93 S.Ct. at 728. It is not, moreover, a severable portion of the challenged articles and rules. Those articles and rules, therefore, like the provisions attacked in *Roe v. Wade, supra,* at 166, 93 S.Ct. at 733, "as a unit, must fall." The State has an interest, undeniably strong, in regulating the practice of medicine to protect the health and safety of its citizens. *See Dent v. State of West Virginia,* 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889);

*Watson v. State of Maryland,* 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987 (1910). Physicians, it must be noted, have traditionally played a central role in the fulfillment of that interest. *See Dent v. State of West Virginia, supra; Doe v. Bolton, supra,* 410 U.S. at 199–200, 93 S.Ct. at 751–752. This Court in no way seeks to alter that role. But in the present case, by limiting the practice of acupuncture to licensed physicians, the State has effectively rendered the treatment unavailable. That it cannot do. The plaintiffs, as they fully acknowledge, *Plaintiffs' Post-trial Brief,* at 10, are not entitled to obtain acupuncture treatment wherever they want, whenever they want, from whomever they want. They are, however, entitled to obtain acupuncture treatment. The challenged articles and rules fail not because they are "unwise, improvident, or out of harmony with a particular school of thought," *Williamson v. Lee Optical of Oklahoma,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), but because they unjustifiably deprive the plaintiffs of their constitutional rights.

So long as it does not "significantly interfere[ ] with," *Zablocki v. Redhail, supra,* the decision to obtain the treatment, the State of Texas is, of course, free to deal with acupuncture as it chooses. It may accord to acupuncturists, as it does to chiropractors, *Tex.Rev.Civ.Stat.Ann.* art. 4512b, full independent professional status. It may allow acupuncturists to practice independently of licensed physicians, but require diagnosis by or referral from such physicians. It may establish appropriate minimum standards of skill and knowledge to be met by those who practice acupuncture. It may even, if it considers such a framework feasible, require acupuncturists to practice under the supervision and control of licensed physicians. *But see Defendants' Post-trial Brief,* at 8 ("Texas physicians are not schooled enough in acupuncture to effectively supervise acupuncturists."). It may choose to regulate acupuncture in some entirely different fashion, or not at all. What it may not do, what it has done in the present case,

**47.** *See* note 22 *supra.*

is to unnecessarily render acupuncture treatment essentially unavailable. That the Constitution prohibits.

In determining the course it intends to follow, the State is encouraged to examine the record in this case. The testimony, the exhibits, and the depositions upon written questions offer instructive insight into the experience of other states. *See* note 44 *supra* for other states' regulations regarding the practice of acupuncture by nonphysicians. In particular, the testimony of Mr. Aldo Avellino, Program Manager for the Board of Medical Quality Assurance of the California Department of Consumer Affairs, was extremely enlightening as to that state's efforts in regulating acupuncture. The Texas Legislature and the Board of Medical Examiners would be well-advised to review it.

The Court is both aware and concerned that to strike the challenged articles and rules is to leave the practice of acupuncture virtually unregulated in the State of Texas. It has, however, little choice. "[W]hile the validity of the challenged provisions is a question calling for a judicial determination, the decision of what to put in their place is . . . a question calling for legislative determination." *Beare v. Smith*, 321 F.Supp. 1100, 1109 (S.D.Tex.1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974). As the articles and rules in question are unconstitutional, the Court must invalidate them; that is its duty. It may not, however, replace them; that is the legislature's duty. In *Roe v. Wade, supra*, the plaintiffs challenged the constitutionality of Texas's abortion statutes. Despite the dangers associated with the unregulated performance of abortions in Texas, the Supreme Court, like the district court, *Roe v. Wade*, 314 F.Supp. 1217, 1224 (N.D.Tex. 1970), simply entered a declaratory judgment holding the statutes unconstitutional. As the unregulated practice of acupuncture is likely to be no more dangerous than the unregulated performance of abortions, this Court will act similarly. Injunctive relief, as in *Roe v. Wade*, 410 U.S., at 166–167, 93 S.Ct., at 733–734, will be denied. This Court "assume[s] the Texas prosecutorial

authorities will give full credence to [its] decision." *Id.* at 166, 93 S.Ct. at 733. *See Poe v. Gerstein*, 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70 (1974); *Wooley v. Maynard*, 430 U.S. 705, 711–713, 97 S.Ct. 1428, 1433–1435, 51 L.Ed.2d 752 (1977); and cases cited therein.

### CONCLUSION

The plaintiffs have a constitutional right, encompassed by the right of privacy, to decide to obtain acupuncture treatment. The challenged articles and rules effectively deprive them of that right and are not necessary to serve the State's interest in protecting the patient's health. That being so, they cannot stand. Articles 4510, 4510a, 4510b, and 4505(12) and (15) of the Texas Medical Practice Act, *Tex.Rev.Civ.Stat. Ann.* arts. 4495–4512, as applied to the practice of acupuncture, and Rules 386.01.12.-001–.002 of the Texas State Board of Medical Examiners are hereby declared unconstitutional. Judgment is entered in favor of the plaintiffs.