The Honorable Steve Harrelson State Representative 300 North State Line Avenue Texarkana, Arkansas 71854-5926
Dear Representative Harrelson:
I am writing in response to your request for an opinion related to the previously issued Op. Att'y Gen. 2008-166. Your request presents a number of arguments related to the authority of the Board of Acupuncture and Related Techniques (the "Board"). I have broken these arguments down into four (4) separate questions in an effort to address all of the legal issues presented:
 1) Would state action leading to refusal to fill prescriptions written by Doctors of Oriental Medicine and/or refusal to provide Doctors of Oriental Medicine with prescription drugs for in office administration violate a patient's right to choose treatment?
 2) Did the General Assembly indicate acquiescence to the Board's regulations by failing to amend the relevant statutes after said regulations were passed?
 3) Does the Board, as the arbiter of statutes controlling the field of acupuncture, have the authority to set the scope of its own rule-making authority?
 4) Does the Board, as the arbiter of statutes controlling the field of acupuncture, have the authority to implement the relevant statutory language in its sole discretion? *Page 2 
RESPONSE
I must note from the outset that I am not a finder of fact nor am I in a position to set policy on the issue at hand. Moreover, I cannot render a final judgment in the dispute that has arisen related to the matters addressed by Op. Att'y Gen. 2008-166 and the present opinion. Significantly, during the pendency of your opinion request, the General Assembly passed legislation (Act 1461 of 2009) stating that the Board's licensees ("licensees") lack the authority to "prescribe, dispense, or administer a legend drug." This legislation also requires the Board to pass new regulations related to this subject. To the extent, however, that this opinion and the new legislation are unable to resolve outstanding issues, legal or otherwise, to the Board's satisfaction, the next appropriate step would be either additional legislation at the next session of the General Assembly or recourse to a court of law.
In response to question one, it is my opinion that, under current legal authority, state action leading to refusal to fill prescriptions written by licensees and/or refusal to provide licensees with prescription drugs for in-office administration would not violate a patient's right to choose medical treatment. In response to question two, it is my opinion that, in light of the provisions ofAct 1461 of 2009, any suggestion of legislative acquiescence to the Board's current regulations is now moot. I further note, however, that because acquiescence is an inference that may arise based on the presence of appropriate facts and circumstances, it is essentially a question of fact. As you know, this office cannot decide questions of fact. In response to question three, it is certainly true that administrative boards are afforded a great degree of deference when adopting regulations related to the statutes that they are charged with enforcing, but they do not determine the scope of their own authority. Rather, the scope of an administrative board's authority is determined by the legislature. In response to question four, while the Board has a good deal of discretion to implement the statutory language in question, it does not have the discretion to exceed the scope of the Act.
Question 1: Would state action leading to refusal to fillprescriptions written by Doctors of Oriental Medicine and/or refusal toprovide Doctors of Oriental Medicine with prescription drugs for inoffice administration violate a patient's right to choosetreatment?
This question was included to respond to your argument that "[P]atient choice in this circumstance is protected broadly by the federal and state constitutional law, *Page 3 
and may not be thwarted by . . . regulatory agencies." In light of your previous reference to Op. Att'y Gen. 2008-166, I read this statement as a suggestion that state action leading to refusal to fill prescriptions written by licensees and/or refusal to provide licensees with prescription drugs for in office administration would violate a patient's right to choose medical treatment.
It is possible that this suggestion was based on an assumption that the analysis set forth in Op. Att'y Gen. 2008-166 is flawed. However, your reliance on the case of Andrews v. Ballard, 498 F.Supp. 1038
(1980), leads me to believe that your argument is that a patient has a fundamental right to receive prescriptions and/or administration of prescription substances from a licensee, regardless of whether the General Assembly has chosen to permit such activity.
I fully acknowledge that Arkansas recognizes a patient's right to control all aspects of their medical treatment, and to choose or refuse life sustaining treatment. See, e.g., A.C.A. § 20-13-104; A.C.A. § 20-17-201 et seq. I further acknowledge that the U.S. Supreme Court has recognized that a patient has a right to make certain choices regarding medical treatment. See, e.g., Planned Parenthood of Southeastern Pa. v.Casey, 505 U.S. 833 (1992) (reiterating right to an abortion by a licensed physician); Cruzan v. Director, Mo. Dept. of Health,497 U.S. 261 (1990) (finding right to refuse lifesaving nutrition and hydration and suggesting right to refuse unwanted medical treatment). For reasons that will be set forth in detail below, however, it does not appear that a patient has the fundamental right to receive the treatment of his or her choice from the provider of his or her choice, regardless of whether state law permits such provider to provide such treatment. As previously noted, you cited the case of Andrews v. Ballard as your primary authority. The Texas District Court in Andrews held that a person's fundamental rights include the right to receive the medical treatment of his or her choice (acupuncture). 498 F.Supp. at 1057. The court concluded that the state cannot interfere with that right by regulating who can provide the chosen treatment in a way that renders the treatment essentially unavailable. Id. First, I believe Andrews is factually distinguishable from the present scenario. The General Assembly has not rendered acupuncture and related techniques essentially unavailable, but has instead provided for the practice of this form of medicine with some apparent limitations. See Op. Att'y Gen. 2008-166. Likewise, the General *Page 4 
Assembly has not rendered prescription drugs essentially unavailable, but has instead apparently limited who may lawfully prescribe them.Id.[1]
Second, my research indicates that Andrews represents a minority approach. The Arkansas Supreme Court has previously indicated its unwillingness to be bound by Andrews. Otte v. Arkansas State Bd. OfAcupuncture, 362 Ark. 279, 206 S.W 3d 225 (2005) (stating in response to the plaintiff's citation of Andrews: "the holding of a district court in Texas in no way binds this court.") Moreover, a number of other jurisdictions presented with the case have reacted unfavorably. For example, a federal district court in Rhode Island stated:
 The Andrews case questioned the limit of government involvement with personal medical choices. A review of other federal court decisions indicates that the government's interest in protecting the health of its citizens often overrides a patient's choice of a particular treatment or medication. See Rutherford v. United States, 616 F.2d 455, 457
(10th Cir.) (court denied patients' right to obtain laetrile) . . . In Rutherford, the court stated that "the decision by the patient whether to have a treatment or not is a protected right, but his selection of a particular treatment . . . is within the area of governmental interest in protecting public health."
Jacob v. Curt, 721 F.Supp 1536, 1540 (1989).
Similarly, the U.S. Court of Appeals for the 7th Circuit stated:
 Notwithstanding Andrews v. Ballard, 498 F.Supp. 1038 (S.D. Tex 1980) . . . most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has *Page 5 
reasonably prohibited that type of treatment or provider. See Mitchell v. Clayton, No. 90-2377, slip op. at 2, 1992 WL 97981 (7th Cir. May 11, 1992); Connecticut v. Menillo, 423 U.S. 9, 11, 96 S.Ct. 170, 171, 46 L.Ed.2d 152 (1975) (no constitutional right to an abortion by a nonphysician); Roe v. Wade, 410 U.S. 113, 165, 93 S.Ct. 705, 733, 35 L.Ed.2d 147 (1973) (same) . . . As we have said, when no fundamental right is implicated, the challenged statute passes constitutional muster as long as the legislature had a rational basis for its enactment.
Mitchell v. Clayton, 995 F.2d 772, 776-66 (7th Cir. 1993) (some internal citations omitted).
Third, relevant United States Supreme Court precedent indicates that the right to receive a treatment of choice from a provider of choice is not a currently recognized fundamental right. In Washington v.Glucksberg, 521 U.S. 702, 719-20 (1997), the Court provided a list of fundamental liberty interests protected from governmental intrusion. Those related to health care included the right "to an abortion" and the "traditional right to refuse unwanted lifesaving medical treatment."Id. The Court reiterated its reluctance to extend constitutional protection to additional asserted rights, stating, "We must therefore `exercise the utmost care whenever we are asked to break new ground in this field[.]" Id. at 721. The Court also rejected the appellant's argument that Planned Parenthood of Southeastern Pa. v. Casey,505 U.S. 833 (1992) and Cruzan v. Director, Mo. Dept. of Health, 497 U.S. 261
(1990) reflect a "general tradition of `self-sovereignty'" that may properly be expanded to other personal decisions regarding healthcare.Id at 725. The Court elaborated:
The right assumed in Cruzan, however, was not simply deduced from abstract concepts of personal autonomy.
 That many of the rights and liberties protected by the Due Process Clause found in personal autonomy do not warrant the sweeping conclusion that any and all important, intimate, and personal decisions are so protected . . . and Casey did not suggest otherwise.
Id. at 725-27 (citations omitted). *Page 6 
Fourth and finally, regulation of medical professions is a classic example of a state's exercise of its inherent police powers:
 In the proper exercise of the police power, a state legislature may control and regulate the practice of medicine in all of its branches, subject only to the rule that these regulations must be reasonable and bear some relation to the end or object to be attained, which is to protect the public . . . The existence and exercise of this regulatory power is clearly justified by the fact that the practice of medicine, unlike many other lawful occupations, requires highly specialized knowledge, training, skill, and care; the fact that the important interests of health and life that are committed to the physician's care; and the fact that patients ordinarily lack the knowledge and ability to judge a physician's qualifications in these respects.
 In the exercise of the power to regulate the treatment of disease, regulations need not be uniform with respect to all methods and systems of practice, but distinctions may be made and schools or methods of practice may be exempted from regulation or subjected to special regulations, so long as the discrimination is not arbitrary or unreasonable.
61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 9 (database updated 2008).
For the foregoing reasons and in light of my opinion, as expressed in Op. Att'y Gen. 2008-166, that the General Assembly has not permitted licensees to prescribe legend (prescription) drugs or obtain such drugs for in-office administration, it is my opinion that, under current legal authority, state action leading to refusal to fill prescriptions written by licensees and/or refusal to provide licensees with prescription drugs for in office administration would not violate a patient's right to choose medical treatment.
Question 2: Did the General Assembly indicate acquiescence to theBoard's regulations by failing to amend the relevant statutes after saidregulations were passed? *Page 7 
Your opinion request suggests that the General Assembly neither amended The Acupuncture and Related Techniques Act (the "Acupuncture Act") nor specifically limited the powers of the Board in response to the Board's passage of regulations regarding the prescriptive authority of its licensees, and, therefore, acquiesced to the Board's regulations as an accurate reflection of the prescriptive authority set forth by the Acupuncture Act. You cite Otte v. Arkansas State Board ofAcupuncture for this proposition. 361 Ark. 279, 206 S.W.3d 225. However, I read Otte as standing for the proposition that a court should not substitute its own judgment for the Board's on matters that have been expressly placed within the Board's discretion by statute. See id. In my opinion, Otte does not address legislative acquiescence.
Moreover, it is my opinion that the very recent passage ofAct 1461 of 2009, moots your suggestion of legislative acquiescence to the board's current regulations. With Act 1461, the General Assembly amended the Acupuncture Act with respect to licensees' prescriptive authority and required the Board to promulgate new regulations in line with these amendments. Act 1461 provides, in relevant part:
 Within thirty (30) days after the effective date of this act, the Arkansas State Board of Acupuncture and Related Techniques shall promulgate new rules to replace the following existing rules: Title I, Title II, Title III, Title IV, Title V, and Title IV.
Act 1461 of 2009, Section 3(b)(5)(B).
I will note that the majority of cases on legislative acquiescence deal with acquiescence to an appellate court's interpretation of a particular statute. See, e.g., Rice v. Ragsdale, ___ S.W.3d ___,2009 WL 331449 (Ark.App. 2009). Acquiescence is typically found where the legislature remains silent for "a long period" following the appellate court's construction of the statute. See id. (discussing a finding of acquiescence where the statute in question had been construed in a particular way since 1877.)
My research on legislative acquiescence did uncover a case where the General Assembly was found to have acquiesced to the administrative interpretation of a particular statute. See Shivers v. MoonDistributors, Inc., 223 Ark. 371, 265 S.W.2d 947 (1954). In that case, the court found that the legislature had *Page 8 
acquiesced where the statutory language in question was reenacted twice despite legislative knowledge of the administrative construction.Id.
It must also be noted that legislative acquiescence is considered an "arguable inference." See Rice. The Shivers court expressly recognized that this inference may not be appropriate in all circumstances: "[T]here may be instances where the legislature re-enacts legislation without knowing all administrative interpretations placed on the former act[.]" 223 Ark. at 374, 265 S.W.2d at 949. Because acquiescence is an inference that may arise based on the presence of appropriate facts and circumstances, it is essentially a question of fact. As you know, this office cannot decide factual disputes. However (and in spite of the apparent mootness of a legislative acquiescence argument at this stage) I will note some of the facts that a court might have considered if faced with the question of whether the General Assembly ever acquiesced to the Board's current regulations regarding the prescriptive authority of licensees.
First, the Acupuncture Act was enacted in 1997 when it originated as House Bill 1031, and the definition of "related techniques" has not been reenacted since that time. Prior to the 87th General Assembly, the Acupuncture Act did not directly address a licensee's prescriptive authority, and does not contain any form of the word prescription, e.g., prescribe, prescriptive, etc. See Op. Att'y Gen. 2008-166. Instead, the Acupuncture Act simply stated that "the recommendation of Chinese herbal medicine lawfully and commercially available in the United States" is a "related technique." A.C.A. § 17-102-102. Therefore, unlikeShivers, this was not a case where the General Assembly reenacted the same language with knowledge of the related regulations.
Second, the primary language in the Board's current regulations purporting to grant licensees prescriptive authority was expressly rejected by the legislature when the Acupuncture Act was passed in 1997. House Bill 1031 originally included "the prescription or administration of any herbal medicine" among its list of "related techniques." However, the March 4, 1997, engrossment removed that language and replaced it with the current language: "the recommendation of Chinese herbal medicine lawfully and commercially available in the United States." This amendment removed the only direct reference to prescriptive authority in the Act at that time. However, it appears that the very language that was deleted from the Acupuncture Act by the General Assembly was later passed by the Board as a regulation. The current Rules and Regulations of the Arkansas State Board of Acupuncture and Related Techniques state that the Scope of *Page 9 
Practice of a Doctor of Oriental Medicine includes "the prescription or administration of any herbal medicine[.]" A court considering whether legislative acquiescence occurred might well have had difficulty finding that the General Assembly acquiesced to language that it expressly removed from the legislation in question.
Question 3: Does the Board, as the arbiter of statutes controllingthe field of acupuncture, have the authority to set the scope of its ownrule-making authority?
While it is certainly true that administrative boards are afforded a great degree of deference when adopting regulations related to the statutes that they are charged with enforcing, they do not determine the scope of their own authority. See Walden v. Hart, 243 Ark. 650,420 S.W.2d 868 (1967) (stating that an act which gives an administrative body complete discretion is invalid as a violation of separation of powers.) Rather, the scope of an administrative board's authority is determined legislatively. Id. For example, the scope of the Board's authority in this instance is set by A.C.A. § 17-102-206. Specifically, with regard to the Board's rulemaking authority, that section states that the Board is authorized to:
 Adopt, publish, and from time to time, revise such rules and regulations not inconsistent with the law as may be necessary to enable it to carry into effect the provisions of this chapter.
A.C.A. § 17-102-206(b)(5) (emphasis added).[2]
Of course, the above-italicized language emphasizes the major limit on the Board's rulemaking authority — the scope of the statutory language itself. I agree that a board is typically well situated to determine whether its rules are within the scope of the relevant legislation through specialization and experience. See Otte, 361 Ark. 279,206 S.W.3d 225. However, this does not mean that a board has unbridled discretion and can never exceed its given authority. See Kettle v.Johnson Johnson, 337 F.Supp. 892 (E.D. Ark. 1992). Rather, there have been a number of instances where the courts concluded that regulations passed by an *Page 10 
administrative board in its judgment and discretion were ultravires of the legislation that they were intended to enforce. See, e.g.,McLane v. Davis, 353 Ark. 539, 110 S.W.3d 251 (2003) (stating that it is the role of the Court to determine if a board has promulgated legislation contrary to an act); See also Kettle, supra at 896 (E.D. Ark. 1992) (stating that administrative agencies are not free to "substitute their own standards — even though they deem them superior — for the standard imposed by the legislative act.")
Question 4: Does the Board, as the arbiter of statutes controllingthe field of acupuncture, have the authority to implement the relevantstatutory language in its sole discretion?
As set forth in my response to question three, above, the Board does not have the authority to exceed the scope of the Acupuncture Act. If the administrative regulations passed by a board exceed a statute's "legitimate interpretation . . . they must fall so that the true [legislative] intent may be vindicated." Kettle, supra at 896.
Assistant Attorney General Jennie Clingan prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] I do recognize that preventing licensees from prescribing/administering prescription drugs may render certain specific treatments previously offered by some licensees more difficult to obtain. However, as will be set forth in greater detail, it appears that these types of limitations on medical practice have traditionally been within the police power of the state. It was recognition of the state's inherent power to regulate medical practice in this fashion that led me to suggest legislative clarification in Op. Att'y Gen. 2008-166. Nomatter how compelling any individual patient's case may be, the AttorneyGeneral's Office has absolutely no authority to determine whether thesetypes of treatments should be available. These are matters of public policy to be decided by the General Assembly and I cannot violate the doctrine of separation of powers.
[2] Act 1461 of 2009, which will not come into effect until after this opinion is issued, adds the following caveat to the Board's rulemaking authority:
 All proposed rules after the effective date of this act shall be approved in writing by the Arkansas State Medical Board under Arkansas Administrative Procedure Act, § 25-15-201 et/ seq.

 *Page 1